1
2
3
4
5
6
7
8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
9
10
11   He,

                     Plaintiff,
12        v.

13   Noem et al,

14                     Defendant.
15

CASE NO. 3-25-cv-05333-DGE

ORDER GRANTING MOTION
FOR TEMPORARY RESTRAINING
ORDER (DKT. NO. 2)

16                    **I      INTRODUCTION**

17        Plaintiff Tong He, proceeding *pro se*, is an international student[1] on an F-1 student visa

18   studying for a master's degree in information studies at Trine University.  (Dkt. No. 1 at 4.)

19   Plaintiff resides in Tacoma, Washington.  (*See id.* at 1.)  He began his academic program in

20   2023.  (*See* Dkt. No. 11-3.)  Plaintiff's only criminal history is a charge in Travis County, Texas

21   for "evading in a motor vehicle" that was dismissed on September 25, 2017.  (Dkt. No. 11-6.)

22

23   ---

[1] Though not stated in his Complaint, Plaintiff stated at an April 24, 2025 TRO hearing that he is
24   a Chinese national.

On April 9, 2025, Plaintiff's record in the Student and Exchange Visitor Information System ("SEVIS") maintained by Immigration and Customs Enforcement ("ICE") was terminated and is no longer in an active status. (Dkt. No. 11-2 at 1.) He received an email from his University on April 11, 2025 advising him of the SEVIS termination, and also advised that, for current students, "You have been withdrawn from all Trine University courses." (*Id.*) The same day, Plaintiff received an email from the United States Consulate General in Krakow, Poland notifying him that his F-1 visa, which had an expiration date of June 13, 2028, had been terminated. (Dkt. No. 11-1 at 1.) The email warned him that remaining in the United States unlawfully could result in deportation, and that "[p]ersons being deported may be sent to countries other than their countries of origin." (*Id.*)

Plaintiff brings claims under the Administrative Procedure Act ("APA") and the Fifth Amendment. (Dkt. No. 1 at 7–11.) Defendants are the Secretary of Homeland Security, the Department of Homeland Security, and the ICE Acting Director (collectively, "Defendants"). (*Id.* at 4.) He moves for a Temporary Restraining Order ("TRO") requiring Defendants to restore his SEVIS record and status. (*See* Dkt. No. 2 at 5.) Because Plaintiff is likely to succeed in his argument that Defendants' actions were arbitrary and capricious, and not in accordance with law, the Court will grant the TRO. *See* 5 U.S.C. § 706(2)(A).

This case is related to several other F-1 visa termination cases in this district, including the first-filed case *Doe v. Noem*, No. 2:25-cv-00633-DGE, in which this court granted a TRO. --- F.Supp.3d ---, 2025 WL 1141279 (W.D. Wash. April 17, 2025.) This order applies substantially and builds on the same reasoning as the original *Doe* case.

## II      BACKGROUND

### A. The F-1 Visa Program and SEVIS

Pursuant to the Immigration and Nationality Act ("INA"), a foreign student may enter the United States in a nonimmigrant status to complete a course of study at an approved educational institution. 8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f). If approved, the State Department will issue a visa allowing the student admission to the United States to pursue their course of study. *See* 22 C.F.R. § 41.61(b)(1). If admitted, DHS may administratively designate the student as an F-1 nonimmigrant classification. 8 C.F.R. § 214.1(a)(2). A key component to admission as an F-1 nonimmigrant student is the presentment of Form I-20, which is "issued in the student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students." 8 C.F.R. § 214.2(f)(1)(i)(A). The F-1 student's Form I-20 is endorsed at the time of entry into the United States and the F-1 student is responsible for "retain[ing] for safekeeping the initial form I-20 or successor form bearing the admission number and any subsequent form I-20 issued to them." 8 C.F.R. § 214.2(f)(1)(ii), (f)(2).

An F-1 student may remain in the United States for the duration of their studies so long as they continue to meet the requirements outlined in the regulations. 8 C.F.R. § 214.2(f)(5)(i) ("Duration of status is defined as the time during which an F–1 student is pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students"). If a student "fails to maintain a full course of study without the approval of a [Designated School Official ("DSO")] or otherwise fails to maintain status," they must depart the United States immediately or seek reinstatement.[2] 8 C.F.R. § 214.2(f)(5)(iv); *see also* 8 U.S.C. § 1184(a)(1).

---

[2] A student may seek reinstatement by submitting an I-539, Application to Extend/Change Nonimmigrant status to United States Citizenship & Immigration Service ("USCIS") and a Form I-20 or a successor form indicating a DSO's recommendation for reinstatement. 8 C.F.R. § 214.2(f)(16)(i). Pursuant to the regulations, a district director "may consider" reinstatement if: (1) student has not been out of status for more than five months at the time of filing or the failure to seek reinstatement within five months was due to exceptional circumstances; (2) student

Work authorization for F-1 students is governed by 8 C.F.R. § 274.12(b)(6).  The

regulation specifies certain classes of noncitizens who are "authorized for employment with a

specific employer incident to status or parole" and may work subject to any conditions of their

nonimmigrant classification, without additional documentation from DHS.[3]  Pursuant to the

regulations, F-1 students may participate in two types of practical training programs: Curricular

Practical Training ("CPT") and OPT, which involves post-graduate practical training in the

student's major area of study.  *See* 8 C.F.R. § 214.2(f)(10).  In order to participate in OPT, a

student must first gain approval from their DSO.  8 C.F.R. §§ 214.2(f)(11)(i). The student must

then apply to USCIS for authorization for OPT employment; a student may not begin the OPT

program until the date indicated on the Employment Authorization Document (Form I-766) the

student receives from USCIS.  8 C.F.R. §§ 214.2(f)(11)(i)(D).  A student has 14 months to

complete the OPT program, unless they receive a 24-month extension for a science, technology,

engineering, or mathematics (STEM) degree.  *See* 8 C.F.R. § 214.2(f)(10)(ii)(C).   Once an F-1

---

"[d]oes not have a record of repeated or willful violations of DHS regulations; (3) student is
pursuing or intending to pursue a full course of study at the school that issued the Form I-20 or
successor form; (4) student has not engaged in unauthorized unemployment; (5) student is not
deportable pursuant to § 237 of the INA; and (6) USCIS is satisfied the violation of status was
beyond the student's control, or the "violation relates to a reduction in the student's course load
that would have been within a DSO's power to authorize, and that failure to approve
reinstatement would result in extreme hardship to the student."  8 C.F.R.§ 214.2(f)(16)(i)(A)–(F).
USCIS's decision to deny reinstatement is unreviewable.  *See* 8 C.F.R. § 214.2(f)(16)(ii).

[3] That includes "[a] nonimmigrant (F–1) student who is in valid nonimmigrant student status and
pursuant to 8 C.F.R. 214.2(f)" is seeking (i) on campus employment, part time during the
academic year or full time when school is not in session, (iii) CPT programs as authorized by the
DSO and I-20, (iv) OPT employment as designated on a form I-766, and (v) a student who is
seeking H-1B status and whose F-1 status has been extended in the interim.  *See* 8 C.F.R. §§
212.2(h); 214.2(f)(5)(vi).  In other words, a student who is maintaining status under 8 C.F.R. §
214.2(f) is eligible for employment consistent with the terms described in that section.

student has completed their course of study and any CPT or OPT, they have sixty days to depart the United States.  8 C.F.R. § 214.2(f)(5)(iv).

A nonimmigrant student's legal status is governed by the F-1 visa system, which is administered by ICE through its Student and Exchange Visitor Program (SEVP).  *Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 175 (3d Cir. 2019).  In turn, SEVIS is an SEVP-managed internet system that tracks and maintains information on nonimmigrant students.  *See* 8 C.F.R. § 214.3(a)(l).  To implement the F-1 visa program, SEVP certifies participating educational institutions, allowing those institutions to issue a Form I-20 in the student's name in SEVIS.[4]  SEVP regulations also govern the termination of F-1 student status in SEVIS.  8 C.F.R. § 214.2(f).  A student may fall out of F-1 status by: (1) failing to meet the regulatory requirements for F-1 student status or (2) via an agency related termination of status.  8 C.F.R. §§ 214.1(d), 214.2(f)(5)(iv).[5]  DHS can terminate an F-1 student's status in three ways: 1) by revoking a previously authorized waiver under 8 U.S.C. § 1182(d)(3) or §1182(d)(4); 2) through the introduction of a private bill in Congress to confer permanent resident status; or 3) if DHS publishes a notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.  8 C.F.R. § 214.1(d).  DHS's ability to terminate an F-1 student's status is limited to the three ways enumerated in § 214.1(d).  *See Jie Fang*, 935 F.3d at 185 n.100.

**B. Defendants Terminate Plaintiff's Record in SEVIS and Visa**

Plaintiff He is an international student who had an F-1 visa and currently resides in Tacoma, Washington.  (*See* Dkt. No. 1 at 1–2.)  He is studying for a Master of Science in

---

[4] *Study in the States*, Dep't of Homeland Sec. (last accessed Apr. 16, 2025), https://studyinthestates.dhs.gov/site/about-sevis; 8 C.F.R. § 214.2(f)(1)(i)–(iii).

[5] The regulations detail circumstances under which the visa holder may be considered to fail to maintain status, including unauthorized employment, willful failure to provide truthful information to DHS, or certain qualifying criminal convictions.  8 C.F.R § 214.1(e)–(g).

Information Studies from Trine University, a program he began in 2023.  (*See* Dkt. No. 11-3.)

(*Id.*)   On April 11, 2025, Plaintiff received an email from his university informing him that his

SEVIS status was terminated by the U.S. government as of April 9, 2025; it did not provide any

rationale for the termination.  (Dkt. No. 11-2 at 1.)  The email stated that as to all current

students in this circumstance, "[y]ou have been withdrawn from all Trine University courses."

(*See id.*)  As for students on OPT/CPT, the University advised: "The termination of your SEVIS

record automatically ends your work authorization. You must stop working immediately to avoid

unauthorized employment."  (*Id.*)

The same day, April 11, 2025, Plaintiff received an email from the Nonimmigrant Visa

Section, United States Consulate General, in Krakow, Poland.  (*See* Dkt. No. 11-1.)[6]  The email

stated that "additional information became available after your visa was issued. As a result, your

F-1 visa with expiration date 13-JUNE-2028 has been revoked under Section 221(i) of the

United States Immigration and Nationality Act, as amended."  (*Id.* at 1.)  The email further

advised that the Bureau of Consular Affairs had advised ICE, which manages SEVIS, of the

revocation, and that ICE in turn may notify Plaintiff's school official.  (*Id.*)  The message warned

of serious consequences resulting from the visa revocation, even raising the possibility that

Plaintiff could be sent to a third country:

> Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa. Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. <u>Persons being deported may be sent to countries other than their countries of origin.</u>

---

[6] Plaintiff stated during the April 24 TRO hearing that he was in Poland at the time he sought his F-1 visa, so the consulate there was the most convenient place for him to apply for the visa, and that is why correspondence regarding the visa has continued to come from the consulate in Poland.

Given the gravity of this situation, individuals whose visa was revoked may wish to demonstrate their intent to depart the United States using the CBP Home App at https://www.cbp.gov/about/mobile-apps-directory/cbphome.

(*Id.* at 1–2.) (emphasis added).

Plaintiff has one interaction with the criminal justice system.  On September 25, 2017 an order of dismissal was entered in a criminal case against Plaintiff in Travis County, Texas.  (*See* Dkt. No. 11-6 at 1.)  A search of that docket record states that Plaintiff was arrested on September 15, 2017 and charged on September 18 with felony "EVADING ARREST DETENTION W/VEH[ICLE]" but that the charge was dismissed on September 25, 2017.  *See* Tex. 427th Dist. Ct. Case No. D-1-DC-17-206317; *see* Tex. Penal Code § 38.04.[7]  The cause for dismissal was stated as "pending further investigation."  (Dkt. No. 11-6 at 1.)  Plaintiff maintains that he has no criminal convictions and complied with all academic terms of his program.  (Dkt. Nos. 1 at 7; 2 at 6.)

During a TRO hearing held on April 24, 2024, Plaintiff stated that he has only one course left to complete on his master's program, and he is currently not permitted to attend any classes as a result of the SEVIS termination.  He further stated that he has employment, but that his work has been paused while this litigation is ongoing, with his employer indicating that he would be able to return to work if his visa status is restored.

Plaintiff initiated this action on April 19, 2025.  (Dkt. No. 1.)  Plaintiff alleges two causes of action under the APA: arbitrary and capricious or contrary to law, and action contrary to a constitutional right.  5 U.S.C. §§ 706(2)(A), 706(2)(B).  (Dkt. No. 1 at 7–9.)  Plaintiff further

---

[7] The Court may take notice of other judicial dockets.  *See United States v. Raygoza-Garcia*, 902 F.3d 994, 1001 (9th Cir. 2018) ("A court may take judicial notice of undisputed matters of public record, which may include court records[.]").

1  alleges Fifth Amendment Procedural Due Process and Equal Protection claims.  (*Id.* at 9–10.)

2  Plaintiff seeks declaratory relief and restoration of his SEVIS record and F-1 status.  (*See id.* at

3  11–12.)  Plaintiff moved for a TRO "enjoining Defendants from enforcing the termination of

4  Plaintiff Tong He's SEVIS record and requiring the immediate restoration of his F-1 student

5  status." (Dkt. No. 2 at 5.)  He then moved for an ex parte TRO, asking this Court to take action

6  without notice to Defendants given the gravity and urgency of the situation.  (*See* Dkt. No. 7.)

7  This Court declined to issue an ex parte TRO.  (Dkt. No. 8.)  While noting "Plaintiff's confusion

8  and legitimate fear caused by the termination of his SEVIS record," the Court found that Plaintiff

9  had not demonstrated why service of process could not be effected on Defendants, and advised

10  Plaintiff that the Court would move promptly on this matter after service was completed.  (*See*

11  *id.* at 2–4.)  Accordingly, after Plaintiff filed an affidavit of service (Dkt. No. 13), this Court

12  scheduled a hearing on the initial TRO motion (*see* Dkt. No. 14), and this Order follows.

13  ### III      LEGAL STANDARD

14        Federal Rule of Civil Procedure 65(b) governs the issuance of a TRO.  "The legal

15  standard for a TRO is substantially identical to the standard for a preliminary injunction."

16  *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020).  To obtain

17  injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a

18  likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that

19  the balance of equities tips in favor of the moving party; and (4) that an injunction is in the

20  public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Generally, a TRO

21  is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

22  entitled to such relief."  *Id.* at 22.  The moving party has the burden of persuasion.  *Hill v.*

23  *McDonough*, 547 U.S. 573, 584 (2006).  "The third and fourth factors, harm to the opposing

24

1    party and the public interest, merge when the Government is the opposing party." *Nken v.*

2    *Holder*, 556 U.S. 418 (2009).

3         The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to

4    which the first and third *Winter* factors are analyzed on a continuum; under such standard, a

5    weaker showing on the merits, combined with a stronger demonstration on the balancing test,

6    might warrant preliminary injunctive relief, assuming the second and fourth *Winter* elements are

7    met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1135 (9th Cir. 2011).

8    Under this "sliding scale" method, the movant need only raise "serious questions going to the

9    merits," but the balance of hardships must tip "sharply" in the movant's favor. *Id.* at 1131–1132;

10   *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

11                                    **IV    JURISDICTION**

12        "Section 704 of the APA provides for judicial review of '[a]gency action made

13   reviewable by statute and final agency action for which there is no other adequate remedy in a

14   court.'" *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952 (9th Cir. 2017)

15   (quoting 5 U.S.C. § 704).  As no statute authorizes judicial review over the termination of SEVIS

16   records, the singular issue here is whether Defendants' termination of Plaintiff's SEVIS record

17   was "final" agency action for which there was no other "adequate remedy." 5 U.S.C. § 704. *C.f.*

18   *Cabaccang v. U.S. Citizenship & Immigr. Servs.*, 627 F.3d 1313, 1316 (9th Cir. 2010).  For

19   agency action to be deemed final, it must "mark the consummation of the agency's decision-

20   making process" and "the action must be one by which rights or obligations have been

21   determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–

22   178 (1997) (internal quotation marks omitted).

23

24

1    As an initial matter, it is apparent that the termination of Plaintiff's SEVIS record is an

2  agency action that implicates "rights and obligations" and may well result in "legal

3  consequences." *Id.*; *see also Jie Fang*, 935 F.3d at 180.  Next, the action appears to constitute

4  the consummation of the agency's decimating process for two reasons.  First, "there is no

5  statutory or regulatory requirement that a student seek reinstatement" of student status in SEVIS,

6  and even if a student attempts to pursue the administrative procedure for SEVIS reinstatement,

7  there is no "mechanism to review the propriety" of the original termination.  *Jie Fang*, 935 F.3d

8  at 182; *see* 8 C.F.R § 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect

9  USCIS' decision. If USCIS does not reinstate the student, the student may not appeal the

10  decision.").  Second, since neither immigration judges nor the BIA have the authority to review

11  SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student

12  can contest the agency action at issue here.  *Jie Fang*, 935 F.3d at 185.; *Ghorbani v. I.N.S.*, 686

13  F.2d 784, 791 (9th Cir.1982); *Tooloee v. I.N.S.*, 722 F.2d 1434, 1438–1439 (9th Cir. 1983).

14  Thus, the termination of Plaintiff's F-1 student status in SEVIS was not "of a merely tentative or

15  interlocutory nature," but rather a unilateral determination with immediate legal consequences

16  over which Plaintiff has no ability to seek administrative review.  *Bennett*, 520 U.S. at 177–178.

17  Accordingly, the Court finds it has jurisdiction to proceed.  *C.f. Jie Fang*, 935 F.3d at 182 ("[t]he

18  order terminating these students' F-1 visas marked the consummation of the agency's

19  decisionmaking process, and is therefore a final order").

20                              **V        ANALYSIS**

21  **A.  Plaintiff Is Likely to Succeed in the Argument that Termination of His SEVIS
       Record was Unlawful**

22    Under the APA, a court shall "hold unlawful and set aside agency action" that is

23  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

24

1  U.S.C. § 706(2)(A).  Here, based on the limited record before the Court, Plaintiff has

2  demonstrated a likelihood of success on two independent grounds under § 706(2)(A): that

3  Defendants' termination of his SEVIS record was not in accordance with law, and that it was

4  arbitrary and capricious.[8]

5          1.  Not In Accordance with Law

6              i.    *Agencies Must Follow Their Own Regulations*

7          It is contrary to law for an agency to disregard its own regulations and policies.  *See Nat'l*

8  *Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003); *Wallace v. Christensen*,

9  802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (an agency is "bound by its own regulations so long as

10  they remain in force.").  As the District of Columbia Circuit has explained:

11          In a series of decisions, the Supreme Court has entertained challenges to agency actions
         that failed to conform to agency regulations. In *SEC v. Chenery Corp.*, 318 U.S. 80, 87–
12          88 (1943), the Court held that an agency is bound to the standards by which it professes
         its action to be judged. In *Accardi,* a case involving a habeas challenge to the denial of
13          suspension of deportation, the Court objected to the agency's 'alleged failure to exercise
         its own discretion contrary to existing valid regulations.'

14  *Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 246 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003)

15  (quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, (1954)) (parallel

16  citation omitted).  Moreover, "'a court's duty to enforce an agency regulation, while most

17  evident when compliance with the regulation is mandated by the Constitution or federal law,'

18  embraces as well agency regulations that are not so required." *Id.* at 247 (alterations omitted)

19  (quoting *United States v. Caceres*, 440 U.S. 741, 749 (1979)).

20

21

22

23  ────────────────
[8] Because the Court finds that Plaintiff has established likelihood of success on his APA claim,
the Court does not reach his Fifth Amendment Due Process or Equal Protection claims at this
24  time.

1    The Ninth Circuit has affirmed that "[p]ursuant to the *Accardi* doctrine, an administrative

2    agency is required to adhere to its own internal operating procedures." *Church of Scientology of*

3    *California v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990); *see also United States v. Nixon*,

4    418 U.S. 683, 696 (1974)*; Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co*., 284 U.S. 370,

5    389 (1932).  Courts have framed the obligation for an agency to follow its own regulations as

6    deriving from § 706(2)(A) or other APA provisions.  *See, e.g., Suncor Energy (U.S.A.), Inc. v.*

7    *United States Env't Prot. Agency*, 50 F.4th 1339, 1352 (10th Cir. 2022) (holding that EPA action

8    violated § 706(2)(A) because it ignored the agency's regulatory definition of "facility"); *Kidd v.*

9    *Mayorkas*, 734 F. Supp. 3d 967, 983–984 (C.D. Cal. 2024) (ICE policy of warrantless "knock

10   and talk" violated agency's regulations and thus § 706(2)(A)).  Agencies must also adhere to

11   internal procedures designed to provide protections to individuals.  *Morton v. Ruiz*, 415 U.S. 199,

12   235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to

13   follow their own procedures."); *see also Lopez*, 318 F.3d at 247; *Beshir v. Holder*, 853 F.Supp.2d

14   1, 11 (D.D.C. 2011) (DHS Secretary's discretion to issue procedural rule pausing processing of

15   adjustment of status applications limited by regulation requiring adjudication in certain

16   timeframe).

17       Accordingly, Defendants are bound to follow their own rules and regulations governing

18   the proper termination of an F-1 student's record in SEVIS.

19           *ii.  Defendants Failed to Follow Their Own Regulations and Procedures*

20       As discussed *supra*, a student's record in the SEVIS system can be terminated either

21   because the student fails to maintain status, or when the agency initiates a termination of status.

22   8 C.F.R. §§ 214.1(d); 214.2(f).  In this instance, there is no evidence that Plaintiff has failed to

23

24

maintain status in his program.  Agency-initiated termination is governed by 8 C.F.R. § 214.1(d), which enumerates circumstances that result in termination:

> Within the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.

Defendants do not argue that any of these criteria are present here.

Additionally, Plaintiff's dismissed evading arrest charge is not a qualifying offense that could lawfully result in SEVIS termination.  DHS's regulations specifically explain what criminal activity results in failure to maintain status for a nonimmigrant:

> A condition of a nonimmigrant's admission and continued stay in the United States is obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed. A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed (regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status under section 241(a)(1)(C)(i) of the Act.

8 C.F.R. § 214.1(g).  A charge that was dismissed without any conviction clearly does not satisfy this criteria.  To the extent that Defendants terminated Plaintiff's SEVIS records merely because his name appeared in a criminal records check, that is inconsistent with their own regulation, which renders the decision invalid under § 706(2)(A).  *See supra*.

Plaintiff's visa was revoked after or around the same time that his SEVIS record was terminated (*see* Dkt. Nos. 11-1 at 1; 11-2 at 1), but this does not make the SEVIS termination lawful.  Recall the distinctions between the F-1 visa and record in the SEVIS system.  *See supra*, Section II(A).  The former is necessary for admission to the United States, the latter indicates maintenance of lawful status.  8 C.F.R. §§ 214.2(f)(1); 214.2(f)(5).  Congress has granted the Secretary of State and consular officers broad discretion to revoke nonimmigrant visas, and such

a determination can only be challenged in removal proceedings.  8 U.S.C. § 1201(i).  But the State Department's own internal policy directs consular officers that "[u]nder no circumstances should you revoke a visa when the individual is in the United States."  *See* 9 FAM 403.11-3(B).[9] Since Plaintiff was already lawfully admitted to the United States his admissibility should have no bearing on his continued lawful presence, and Defendants have identified no authority that permits them to terminate a SEVIS record on the basis of a visa revocation.  ICE's own internal policy guidance confirms that "[v]isa revocation is not, in itself, a cause for termination of the student's SEVIS record."  *Policy Guidance 1004-01—Visa Revocations*.[10]   Likewise, State Department guidance confirms that after a nonimmigrant exchange student visa is revoked, "the visa is no longer valid for *future* travel to the United States" but only "*after* the individual's departure from the United States, sponsors should terminate his or her program status in SEVIS."  *Guidance Directive 2016-03 9 FAM 403.11-3 – Visa Revocation*.[11]  Thus, the revocation of He's F-1 visa does not serve as a ground for the SEVIS termination.

Additionally, Defendants indicated at the April 24, 2025 hearing they are unable to state whether termination of the SEVIS record invalidates a student's nonimmigrant status.  This position is inconsistent with the regulatory scheme.  First, the SEVIS system provides a school the means to report a student's compliance with requirements for maintaining F-1 nonimmigrant status (as indicated on form I-20).  *See* 8 C.F.R. §§ 214.2(f)(1)(iii); 214.3.  If a SEVIS record is

[9] U.S. State Department, Foreign Affairs Manual (last updated Oct. 2, 2024) https://fam.state.gov/fam/09FAM/09FAM040311.html.

[10] *Policy Guidance 1004-01—Visa Revocations*, U.S. Immigration and Customs Enforcement, 3, (June 7, 2010) https://www.ice.gov/doclib/sevis/pdf/visa_revocations_1004_04.pdf.

[11] *Guidance Directive 2016-03 9 FAM 403.11-3 – Visa Revocation*, U.S. Dep't of State Bureau of Educational and Cultural Affairs Private Sector Exchange, 1–2, (Sept. 2, 2016) https://j1visa.state.gov/wp-content/uploads/2019/05/2016-03_GD_Visa_Revocation_FINAL_Sept_2016.pdf.

terminated, the school can no longer report the student's compliance; DHS advises that "[o]nce the student has been terminated you will not be able to take any action on this student or print the student's record without requesting reinstatement."[12]  Thus, the school and the student have no way of establishing the student remains in valid nonimmigrant status.  Second, the SEVIS record termination means "a student loses all on- and/or off-campus employment authorization."[13]  But cancellation of employment authorization can only mean that a student has failed to maintain status and therefore is no longer in nonimmigrant status.  *See* 8 C.F.R. § 214.2(f)(9)(ii)(A) ("The employment authorization is automatically terminated whenever the student fails to maintain status."); 8 C.F.R. § 274a.12(b)(6) (identifying that a nonimmigrant F-1 student who is in valid nonimmigrant status is authorized for employment).  Thus, it is inconsistent for the government to acknowledge it terminated Plaintiff's SEVIS record while failing to acknowledge it has terminated Plaintiff's lawful nonimmigrant status.  To the extent the Government admits to terminating the SEVIS records of students who have properly maintained their status, that would be a misuse of the system and contrary to the relevant regulations.

Accordingly, termination of the SEVIS record because of a dismissed evading arrest charge is inconsistent with agency regulations and procedures, which renders the decision invalid.  *Nat'l Ass'n of Home Builders*, 340 F.3d at 852; *Wallace*, 802 F.2d at 1552 n.8.  Because Defendants' termination of Plaintiff's SEVIS records were—based on the limited information

---

[12] U.S. Dep't Homeland Sec., *Study in the States: Complete Program* (July 17, 2024), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/complete-program.

[13] U.S. Dep't Homeland Security, *SEVIS Help Hub: Terminate A Student* (Nov. 7, 2024.) https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student.

1   currently available—not authorized by and violated their own regulations, Plaintiff is likely to

2   succeed in the argument that the agency action is not in accordance with law under § 706(2)(A).

3       2. <u>Arbitrary and Capricious for Lack of Explanation</u>

4       Agency action is considered arbitrary and capricious if "the agency has relied on factors

5   which Congress has not intended it to consider, entirely failed to consider an important aspect of

6   the problem, offered an explanation for its decision that runs counter to the evidence before the

7   agency, or is so implausible that it could not be ascribed to a difference in view or the product of

8   agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*.,

9   463 U.S. 29, 43 (1983).  As the Ninth Circuit has explained, the "critical factor in *Motor Vehicle*

10  was that the agency 'submitted no reasons at all' for its decision." *McFarland v. Kempthorne*,

11  545 F.3d 1106, 1113 (9th Cir. 2008) (citing *Motor Vehicle*, 463 U.S. at 50).  The *Motor Vehicle*

12  standard has been applied to review individualized agency decisions as well as agency rules.

13  *See, e.g*., *Does 1 through 16 v. U.S. Dep't of Homeland Sec*., 843 F. App'x 849, 852 (9th Cir.

14  2021); *McNeely v. United States Dep't of Lab*., 720 F. App'x 825, 827 (9th Cir. 2017).

15      In this instance, Defendant has failed to meet "the general administrative-law requirement

16  that an agency 'articulate a satisfactory explanation for its action.'"  *Hernandez v. Garland*, 52

17  F.4th 757, 768 (9th Cir. 2022) (quoting *State Farm*, 463 U.S. at 43).  Indeed, Defendant has

18  failed to suggest any lawful grounds as to why its action here is lawful under the APA.  *Motor*

19  *Vehicle*, 463 U.S. at 50.  Defendants' submission that they "do not concede that He has

20  demonstrated a likelihood of success on the merits on his APA claim" but cannot defend it

21  because "DHS and from the Department of State, and Defendants have not completed

22  [factfinding] efforts in time to respond to He's motion" is inadequate under governing law.  (Dkt.

23  No. 17 at 8.)  *C.f. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30

24

(2020).[14]   The Court declines to "deny He's motion even in the absence of this factual

information related to the APA claim."  (Dkt. No. 17 at 8.)  Indeed, Defendant's failure to

provide a single plausibly lawful explanation for its action—an explanation reasonably grounded

somewhere in the statutory scheme—is the exact circumstance contemplated by the arbitrary and

capricious standard.  *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir.

2015) (en banc) ("[*Motor Vehicle*] teaches that even when reversing a policy after an election, an

agency may not simply [change courses] without a reasoned explanation.").

Accordingly, Plaintiff is also likely to prevail on the claim that the agency action is

arbitrary and capricious for failing to "articulate a satisfactory explanation for its action

including a rational connection between the facts found and the choice made."  *Motor Vehicle*,

463 U.S. at 43.

## B.  Remaining TRO Factors Favor Plaintiff

### 1.  Plaintiff Faces Irreparable Harm

Plaintiff faces several forms of irreparable harm as a result of the termination of his

SEVIS record.  First, Plaintiff is unable to continue his graduate level studies, because as a result

of the SEVIS termination his university has withdrawn him from all courses.  Second, while

Defendants have not yet placed Plaintiff into removal proceedings, he faces the prospect of

detention, removal proceedings, and ultimately removal because termination of his SEVIS record

indicates that he is not maintaining status in his program.  *See* 8 U.S.C. §§ 1227(a)(1)(B);

1227(a)(1)(C)(i).  That fear is especially acute in Plaintiff's case because the U.S. Consulate

---

[14] An agency need not consider every conceivable alternative, but when it is "not writing on a blank slate" it must consider the impact of its actions on vested reliance interests, especially in the immigration context, where individuals make "time-bounded commitment[s], to allow them to, say, graduate from their course of study."  *Regents*, 591 U.S. at 32–33.

advised him to leave the United States due to risk of deportation, even suggesting he could be

removed to a country other than his place of origin.  (*See* Dkt. No. 11-1.)  Plaintiff's fears are not

speculative, as DHS's own public-facing guidance states that a person whose SEVIS record is

terminated faces the following consequences:

- Student loses all on- and/or off-campus employment authorization.

- Student cannot re-enter the United States on the terminated SEVIS record.

- Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student.

- Any associated F-2 or M-2 dependent records are terminated.[15]

Importantly, as indicated above, termination revokes all employment authorization and

provides ICE agents a basis to investigate a student's departure, which could only mean the

student no longer maintains lawful status in the United States otherwise why the need to confirm

their departure.

Turning now to examine each irreparable harm in more detail, the Court begins by

discussing Plaintiff's inability to continue in his graduate program.  As noted, Plaintiff's

university removed him from his courses on account of his SEVIS termination.  (Dkt. No. 11-2

at 1.)  Whether or not the university was legally required to take that action, it clearly did so in

response to Defendants' termination decision.  (*See id.*)  In numerous similar cases regarding F-1

visas around the nation in recent days, courts have concluded that "[t]he loss of timely academic

process alone is sufficient to establish irreparable harm."  *Isserdasani v. Noem*, No. 25-CV-283-

WMC, 2025 WL 1118626 (W.D. Wis. Apr. 15, 2025); *see also Liu v. Noem*, No. 25-cv-133-SE,

op. at 4 (D.N.H. April 10, 2025); *see also B K v. Noem*, No. 1:25-CV-419, 2025 WL 1171572

---

[15] *See* Dep't Homeland Security, *supra* note 13.

(W.D. Mich. Apr. 23, 2025) ("The loss of timely academic progress, whether such progress is accomplished in preparing a dissertation or gaining practical work experience, is simply not compensable by money damages"); *Doe, v. Noem*, No. 3:25-CV-00023, 2025 WL 1161386, *6 (W.D. Va. Apr. 21, 2025); *Yang v. Noem*, No. 25-CV-292-WMC, 2025 WL 1166521, *4 (W.D. Wis. Apr. 22, 2025); *Ratsantiboon v. Noem*, No. 25-CV-01315 (JMB/JFD), 2025 WL 1118645, *2 (D. Minn. Apr. 15, 2025); *Patel v. Bondi*, No. 1:25-CV-00103, 2025 WL 1158708, *2 (W.D. Pa. Apr. 21, 2025); *Saxena v. Noem*, No. 5:25-CV-05035-KES, 2025 WL 1149498, *2 (D.S.D. Apr. 18, 2025); *Chen v. Noem*, No. 25-CV-03292-SI, 2025 WL 1150697, *5 (N.D. Cal. Apr. 18, 2025). Further, during the April 24 TRO hearing, Plaintiff stated he has only one course left to complete on his master's program, amplifying the harm of being withdrawn from classes now. *See e.g.*, *Tully v. Orr*, 608 F. Supp. 1222, 1225, 1226 (E.D.N.Y. 1985) (disenrollment of Air Force Academy cadet "just prior to his examinations and graduation," causing him to repeat courses and delay graduation, was irreparable harm). Here, Plaintiff is unable to continue in his academic work, and the longer that condition persists, the greater his educational loss, risk of needing to repeat coursework, and ultimate delay in completion.

Additionally, Plaintiff indicated at the TRO hearing that he has employment, but his employer has paused his employment until litigation restores his visa status and work authorization. Multiple courts have held that loss of or delay in obtaining employment authorization is an irreparable harm. *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020), *order dissolved sub nom. Casa de Maryland, Inc. v. Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18, 2023) (a delay in an asylum seeker obtaining work authorization is an irreparable harm because "every additional day these individuals wait will visit[] on them crippling dependence on the charity and good will of others"); *Batalla Vidal*

*v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018), *vacated and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) (finding that if the DACA program were terminated, resulting loss of work authorization for DACA recipients would be an irreparable harm).  Based on Plaintiff's representations, entry of a TRO will allow him to resume work.

Next, the Court considers the threat of removal.  Removal is not by itself an irreparable harm, in part because removal is (in at least some instances) reversible.  *See Nken*, 556 U.S. at 430.  However, in this case, the ordinary harms of removal would be amplified because removal would hinder or eliminate Plaintiff's ability to complete his degree program, when he has only one course remaining.  Even if a removal order could be reversed or Plaintiff could start a different master's program elsewhere, there is no guarantee that Plaintiff's injuries could be effectively remedied at a later date (e.g., Plaintiff may need to reapply for admission and/or repeat incomplete coursework, or may not find a comparable program to the one he is in now).  Plaintiff's fears of removal are especially justified because the U.S. consulate specifically warned him that removal "can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States" and that "[p]ersons being deported may be sent to countries other than their countries of origin."  (Dkt. No. 11-1 at 1.)  Plaintiff's fear must also be viewed in a context where other student visa holders have been suddenly detained around the nation.  *B K et al v. Noem et al*, No. 1:25-CV-419, 2025 WL 1171572 (W.D. Mich. Apr. 23, 2025) (citing *Ozturk v. Trump*, No. 25-CV-10695-DJC, 2025 WL 1009445, at *1 (D. Mass. Apr. 4, 2025) ("[W]ithout prior notice of the revocation of her student visa or the grounds asserted for same, Ozturk, a graduate student in Child Study and Human Development at Tufts University, was approached and surrounded by six officers (several wearing masks

1    and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an

2    unmarked vehicle."). Without interim relief from this Court, Plaintiff would continue to live

3    under the specter of these harms on a daily basis.

4        2.    There is a Public Interest in Enforcement of Valid Regulations, and Balance of
              Equities Favor Plaintiff

5

6        "When the government is a party, the balance of equities and the public interest factors

7    merge." *Nken*, 556 U.S. at 435.  The public has a vested interest in a federal government that

8    follows its own regulations.  As one court framed it: "the public has a strong interest in having a

9    [government] that conducts itself fairly and according to its stated regulations and policies."

10   *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos*

11   *Council, Inc. v. Kempthorne*, No. CV 06-745 WJ/ACT, 2006 WL 8443876, *5 (D.N.M. Sept. 15,

12   2006) ("It is in the public interest that federal agencies comply with their own policies and with

13   federal statutes.").  Here, Defendants assert that the public interest factors tip in their favor

14   because the "public interest lies in the Executive's ability to enforce U.S. immigration laws."

15   (Dkt. No. 17 at 8.)  However, Defendants have provided *no indication* that they complied with

16   the relevant statutory scheme to "enforce U.S. immigration laws" in this case.  (*Id.*)

17   Accordingly, this is a set of circumstances where the government and its decision-making

18   processes will be best served by judicial review of a decision—and maintenance of the status quo

19   during that review—that appears both unlawful and likely to cause Plaintiffs irreparable harm.

20   Moreover, Defendants have not put forth evidence of how a TRO would cause them injury or

21   harm.  For these reasons, the Court determines that the balance of the equities and public interest

22   factors tip sharply in Plaintiffs' favor.

23       Finally, the Court addresses Defendant's argument that Plaintiff is "not only seeking to

24   preserve the status quo on a temporary basis" but is rather requesting "an order compelling the

Defendants to change the status quo" because "He seeks emergency restoration of a record that has already been marked as terminated." (Dkt. No. 17 at 6.) Courts have long held that the "status quo ante litem" for the purposes of considering a temporary restraining order or preliminary injunction "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy.'" *GoTo.com, Inc. v. Walt Disney Co*., 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963). An interpretation of "status quo as the moment before filing a lawsuit but after alleged misconduct began "would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun." *Id*.

This standard has been applied to government action as well as private disputes. *See, e.g., Doe #1 v. Trump*, 957 F.3d 1050, 1068–1069 (9th Cir. 2020); *S.A. v. Trump*, No. 18-CV-03539-LB, 2019 WL 990680, *13 (N.D. Cal. Mar. 1, 2019). For example, in *S.A.*, the court concluded that the status quo ante litem was the point before DHS stopped processing conditionally approved beneficiaries under a dual refugee/parole program. *See S.A.*, 2019 WL 990680, at *13. Accordingly, the court vacated DHS's decision to mass-rescind conditional approvals for 2,714 beneficiaries pending a final determination on the merits because that maintained the status quo ante litem. *Id*. at *17. Similarly, in this case, the "legally relevant relationship between the parties before the controversy arose," describes the state of affairs *prior* to the termination of Plaintiff's SEVIS record. *Ariz. Dream Act Coalition v. Brewer*, 757 F. 3d 1053, 1060–1061 (9th Cir. 2014). Accordingly, Defendant's argument that "the relief He seeks is not a prohibitory injunction to maintain the status quo" is frustrated by decades of Ninth Circuit caselaw. (Dkt. No. 17 at 2.)

1    Finally, Defendant advances a confused argument that posits Plaintiff seeks "a final

2  judgement on the merits" because a TRO is part of the final relief outlined in his complaint.

3  (Dkt. No. 17 at 2.)  Defendants are correct that "it is generally inappropriate for a federal court at

4  the preliminary-injunction stage to give a final judgment on the merits."  *University of Texas v.*

5  *Camenisch*, 451 U.S. 390, 395 (1981).  But what the *Camenisch* court was communicating was

6  that findings of fact and conclusions of law made by a court in a preliminary injunction or TRO

7  posture are preliminary and do not bind the court at the trial on the merits.  *Id*. at 395–398.  Thus,

8  it is not appropriate to enter a *final judgement* at a TRO stage.  *Id*.  That is not what the Court is

9  doing here.  As the *S.A.* court emphasized, "nothing in *Camenisch* holds that the scope of a

10  preliminary injunction cannot overlap with the relief requested for an eventual final judgment."

11  S.*A*, 2019 WL 990680, at *16 n.59.  Here, as in *S.A.*, the order makes no final findings on the

12  merits and merely returns the parties to the status quo ante litem.

13    **C.  The Court Will Not Require a Bond**

14    Under Federal Rule of Civil Procedure 65(c), in granting a PI or TRO, the court must

15  require a movant to pay security "in an amount that the court considers proper to pay the costs

16  and damages sustained by any party found to have been wrongfully enjoined or restrained."  The

17  Ninth Circuit has held that "[d]espite the seemingly mandatory language, Rule 65(c) invests the

18  district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*,

19  572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir.

20  2003)) (cleaned up).  "In particular, '[t]he district court may dispense with the filing of a bond

21  when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or

22  her conduct.'"  *Id.* (quoting *Jorgensen,* 320 F.3d at 919).  Here, Defendants request that the

23  Court impose a bond "in an amount the Court determines to be appropriate."  (Dkt. No. 17 at 10.)

24

Defendants do not account for any costs they allege they will face if the TRO is issued erroneously, and the Court perceives none. Here, Defendants will face no cost from Plaintiff resuming his work and studies as he did before his SEVIS record was terminated, and negligible or zero cost from restoring his SEVIS status to active. Plaintiff's only criminal history is an evading arrest charge that was dismissed, and he poses little if any risk to the public. The Court therefore exercises its discretion to waive the bond requirement.

## VI    ORDER

Accordingly, it is ORDERED that Plaintiff's Motion for a Temporary Restraining Order (Dkt. No. 2) is GRANTED. Defendants are ENJOINED for a period of fourteen days from the date of this order, as follows:

1) Defendants shall restore Plaintiff's F-1 student record and I-20 in the Student and Exchange Visitor Information System (SEVIS);

2) Defendants shall set aside the F-1 student record and I-20 termination, on or about April 9, 2025, as to Plaintiff;

3) Defendants shall not terminate Plaintiff's student record and I-20 in SEVIS absent a valid ground as set forth in 8 C.F.R. §§ 214.1(d)–(g); 214.2(f).

4) Defendants are prohibited from detaining or transferring Plaintiff out of this Court's jurisdiction, or ordering the detention or transfer of Plaintiff out of this Court's jurisdiction, as a result of the termination of his F-1 student record or I-20 in SEVIS on or about April 9, 2025; and

5) Defendants are prohibited from initiating removal proceedings against or removing Plaintiff on the basis of the termination of his F-1 student record or I-20 in SEVIS on or about April 9, 2025.

It is furthered ORDERED that the security requirement of Rule 65(c) is waived.

Scheduling Order for Preliminary Injunction

This Temporary Restraining Order is in effect for <u>14 days</u> from today's date, according to Federal Rule of Civil Procedure 65(b)(2).  To obtain relief beyond that point, Plaintiff must file a Motion for Preliminary Injunction.  *See* Fed. R. Civ. P. 65(a).  As stated on the record at the April 24 hearing, Plaintiff should supplement the record with any additional evidence in his possession regarding the termination of his SEVIS record and irreparable harm.

The Court ORDERS the Parties to appear for a Preliminary Injunction hearing at 2:30 p.m. PT on May 7, 2024.

Plaintiff SHALL file his opening brief by 12:00 p.m. May 2, 2025.

Defendants SHALL respond by 2:00 p.m. May 5, 2025.

Plaintiff SHALL file his reply by May 6, 2025.

The hearing will be held in person at the Tacoma Union Station Courthouse, Courtroom B.  The Court expects both parties to appear in person.  Plaintiff's existing Motion to Appear Remotely (Dkt. No. 3) is STRICKEN as moot as he was permitted to attend the TRO hearing remotely on April 24.  However, if Plaintiff still wishes to appear remotely, he is ORDERED to file a new declaration stating specifically why he cannot appear in person and why remote appearance is necessary.  Absent order from the Court, Plaintiff SHALL appear in person on May 7, 2024.

SO ORDERED.

Dated this 25th day of April, 2025.

David G. Estudillo

1    United States District Judge

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24